# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No. 2:19-mj-621
as a two-story apartment described as tan in color vinyl )
siding over brick in the rear of the building. The front is tan )
siding with brown squares with white trim. The numbers 2217 )
are on the rear fence of the apartment building in brown color )
and the curtilage thereof. )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

located in the ___Southern___ District of ___Ohio___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

The application is based on these facts:

See attached Affidavit (incorporated by reference)

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jacob Smith, DEA TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/2/2019

_____
*Judge's signature*

City and state: Columbus, Ohio                    Norah McCann United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

**2217 Noe Bixby Road, Columbus, Ohio, 43232** is described as a two-story apartment, tan in color with vinyl siding over brick in the rear of the building. The front of the structure is described as tan siding with brown square outlined designs on the front of the building with white trim around the windows. The numbers "2217" are affixed horizontally in dark numbering against the brown fence which is located in the rear of the residence. The front door is white in color with a glass and barred exterior storm door. The front door of the residence is one door north of 2219 Noe Bixby Road. There are no visible numbers identifying the address on the front of the residence.

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

The evidence to be searched for and seized is:

A. Methamphetamine and any other controlled substances;

B. Documents and other items tending to show dominion and control over the premises/vehicle, including, but not limited to, bills or other business-related documents, correspondence, photographs;

C. Documents or other items tending to identify co-conspirators and sources, including, but not limited to, letters, notes, memoranda, photographs, address and phone books, maps, organizers, or lists of names;

D. Items commonly used to facilitate drug trafficking, including but not limited to items such as firearms, ammunition, , cellular telephones, pay/owe sheets, packaging materials, "cut", scales, and grinders;

E. Likely proceeds of drug trafficking, such as United States currency and other negotiable instruments; and

F. Documents and other items tending to establish or hide the whereabouts of proceeds from drug trafficking, such as safes, keys to other locations, and financial records.

# AFFIDAVIT

Your Affiant, Jacob Smith, being duly sworn, do hereby depose and state as follows:

## I.

## INTRODUCTION

1. I am currently employed as a Deputy for the Franklin County Sheriff's Office, currently assigned full-time as a Task Force Officer with the Drug Enforcement Administration (DEA) Columbus District Office. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code (U.S.C.) § 2510(7), that is, an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in Title 18, U.S.C.§ 2516. Your affiant is empowered to investigate, to make arrests with or without warrants and to execute search warrants under the authority of Title 21 U.S.C. § 878 and the Ohio Revised Code. Since 2013, Your affiant has been employed with the Franklin County Sheriff's Office. Prior to that employment, Your affiant was employed with multiple law enforcement agencies within the State of Ohio for approximately three years. Those law enforcement agencies include the Village of Obetz Police Department as a full-time Officer, Sharon Township Police Department as a part-time Officer and the Westerville Police Department as a reserve Officer.

2. Prior to being assigned to the DEA Task Force in February 2019, Your affiant was a Detective with the Franklin County Sheriff's Office (FCSO), Special Investigations Unit and had been assigned to that unit since July 2014. Your affiant, while assigned to the Special Investigations Unit, has conducted or participated in numerous state and federal narcotics investigations concerning the possession and distribution of controlled substances. Your affiant was also assigned to the FCSO Heroin Overdose Prevention and Education (H.O.P.E) Task Force where I conducted numerous criminal investigations pertaining to fatal and non-fatal overdoses, these investigations resulted in convictions in Franklin County Common Pleas Court and United States District Court, Southern District of Ohio.

3. As a DEA Task Force Officer, I have participated in numerous investigations which have resulted in the successful prosecution of individuals and organizations involved in trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine and other controlled substances. Through the course of these investigations, I have personally interviewed confidential sources and other persons involved in the distribution of illegal narcotics. I have also interviewed persons arrested for the distribution of illegal narcotics. I have spoken with more experienced narcotics investigators with whom I have worked concerning the practices of narcotics traffickers and the best investigative methods to use when conducting investigations of narcotics trafficking organizations. Through the

1

course of my investigations and through my conversations with more experienced narcotics investigators, I have become familiar with the methods and means utilized by persons who participate in the illegal distribution of controlled substances

## II.

## PURPOSE OF AFFIDAVIT

4. This Affidavit is made in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for:

   a. the residential property located at **2217 Noe Bixby Road, Columbus, Ohio, 43232** (hereafter referred to as the **TARGET LOCATION**). This premises is more fully described in Attachment A incorporated herein by reference.

   b. **2015 Black Chrysler 300** (hereafter referred to as the **TARGET VEHICLE**). This vehicle is more fully described in Attachment A incorporated herein by reference.

5. Based upon the information below, I have probable cause to believe that inside the **TARGET LOCATION** and **TARGET VEHICLE** described in the previous paragraph, there is property that constitutes evidence of the commission of a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and property designed or intended for use or which is or has been used as a means of committing a criminal offense. Specifically, I have probable cause to believe that within the above mentioned property there is evidence of violations of Title 21, United States Code (U.S.C.) § 846, Conspiracy to Possess with Intent to Distribute and Distribute a Controlled Substance (Methamphetamine) and Title 21, U.S.C. § 841(a)(1), Possession with Intent to Distribute and Distribution of a Controlled Substance. Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment B (incorporated herein by reference) will be found at the **TARGET LOCATION** and **TARGET VEHICLE** described in Attachment A.

6. The information contained in this Affidavit is largely based upon investigations conducted by Your Affiant and other law enforcement officers. All of the details of the investigation are not included in this Affidavit, only information necessary to establish probable cause that evidence associated with drug trafficking offenses is located at/in the **TARGET LOCATION** and **TARGET VEHICLE**. Unless specifically quoted, the conversations described below are set forth in substance.

## III.

## FACTS SUPPORTING PROBABLE CAUSE

7. On March 28, 2019, at approximately 10:30 p.m., DEA (Columbus) TFO Bryan Mason was contacted by Columbus Division of Police (CPD) regarding a traffic stop involving Cameron VANSICKLE. According to CPD Officers, they had initiated a traffic stop on a vehicle being operated by VANSICKLE for a traffic violation in the Columbus area. During the traffic stop, it was discovered VANSICKLE was operating the motor vehicle with a suspended driver's license. During an Administrative Inventory of the vehicle, officers recovered approximately 100 grams of suspected methamphetamine from the passenger glove box. VANSICKLE was transported to the DEA Columbus District Office to be interviewed by investigators.

8. Upon arriving at the DEA office, DEA TFO Ashenhurst verbally advised VANSICKLE of his Miranda rights. VANSICKLE acknowledged his understanding of his rights and voluntarily agreed to speak with investigators. During the interview, Your Affiant and TFO Ashenhurst questioned VANSICKLE about the suspected methamphetamine found inside the vehicle. VANSICKLE stated, in substance, that he had purchased the methamphetamine for $1050. VANSICKLE stated he provided $100 of his own money toward the total purchase amount of $1050. VANSICKLE also stated K.R. had provided an unknown portion of money toward the total as well. VANSICKLE explained the total amount ($1,050) used to purchase the methamphetamine came from multiple individuals to include himself and K.R. During the interview, VANSICKLE admitted he organized the narcotics transaction for the methamphetamine, collecting money from multiple individuals in order to obtain a larger amount of methamphetamine, which allowed VANSICKLE to purchase the methamphetamine at a better price point.

9. VANSICKLE further informed investigators that he met with an individual he knows as "Juice" to purchase the methamphetamine which was found by CPD Officers during the inventory of the vehicle. VANSICKLE provided investigators with telephone number 614-679-4009 which he stated is utilized by "Juice." Upon reviewing toll records, investigators were able to corroborate and confirm telephone communication between VANSICKLE's phone and 614-679-4009 on March 28, 2019 prior to the initiation of the traffic stop involving VANSICKLE.

10. The suspected methamphetamine was submitted to the DEA North Central Laboratory for chemical analysis. On July 26, 2019, TFO Mason received laboratory results confirming the suspected methamphetamine tested positive for d-Methamphetamine Hydrochloride with net weight of 97.3 grams and a substance purity of 100%.

3

11. In May 28, 2019, DEA (Columbus) investigators learned that a law enforcement officer acting in an undercover capacity purchased approximately twenty-eight (28) grams of suspected methamphetamine from a known individual in the Columbus, Ohio area. During the transaction, the known individual contacted a male, later identified by the undercover officer utilizing a law enforcement database. The male was identified for purposes of this affidavit as "R.L."

12. During the narcotics transaction, while in the presence of the undercover officer, R.L. met with an individual (later identified by the undercover officer as Robert DAVIS) at the Pelican bar located at 5512 E. Livingston Avenue in Columbus, Ohio. During the meet, R.L., who was in the front passenger seat of the undercover officer's vehicle, provided DAVIS with $400 in United States currency. The $400 was previously provided to R.L. by the undercover officer in order to purchase the suspected methamphetamine. Upon R.L. providing DAVIS with the currency, DAVIS handed R.L. two clear plastic bags containing a hard, white rock like substance, believed to be methamphetamine. At this time, R.L. provided the undercover officer with only one (1) of the bags containing the suspected methamphetamine to complete the transaction. The remaining bag provided to R.L. by DAVIS was believed to remain in the possession of R.L.

13. Your affiant knows, through training and experience, it is common for individuals to utilize a third party to contact the source of supply for narcotics. Your affiant knows, those third party individuals act as "brokers" which allow the purchaser of the narcotics to obtain the narcotics from the source of supply which only the broker has contact with. The "broker" will commonly obtain payment, whether monetary or other forms of payment for connecting the purchaser and source of supply to complete the narcotics transaction.

14. On May 31, 2019, the Honorable Franklin County Common Pleas Judge Karen Phipps authorized a search warrant for the geo-location of the cellular phone associated with 614-679-4009, known to be utilized by Robert DAVIS also known as "Juice." During the course of subsequent physical surveillance combined with geo-location data transmitting from telephone number 614-679-4009, DAVIS was confirmed to be the primary possessor and user of the cellular phone associated with 614-679-4009.

15. On June 5, 2019, the Honorable Franklin County Municipal Court Duty Judge authorized a search warrant for the installation of a Global Position System (GPS) device for a black 2015 Chrysler 300 (**TARGET VEHICLE**) known to be operated by DAVIS. DAVIS is also the registered owner of this vehicle. During the duration of monitoring, investigators have observed DAVIS' Chrysler staying consistently overnight at or in the area of the apartment building which houses 2217 Noe Bixby (**TARGET LOCATION**).

16. On June 13, 2019, investigators conducted surveillance on DAVIS. During surveillance, DAVIS' vehicle was located parked in the rear of the apartment

4

building which houses 2217 Noe Bixby Road in Columbus, Ohio. During surveillance, DAVIS and an unidentified black male were observed leaving the apartment complex in the Chrysler 300. Upon leaving, investigators followed DAVIS to a United Dairy Farmers (UDF) parking lot located at 2660 Noe Bixby Road in Columbus, Ohio. While at the UDF, DAVIS was observed meeting with an individual, identified for purposes of this affidavit as Source of Information 1 (SOI-1). During their interaction, DAVIS was observed opening the rear driver's side door of SOI-1's vehicle and briefly leaning in. Once this was observed SOI-1 and DAVIS left the UDF parking lot in separate vehicles shortly after.

17. On June 15, 2019, DEA officers conducted surveillance on DAVIS. During surveillance, DAVIS was observed operating the **TARGET VEHICLE**. While on surveillance, DAVIS was observed entering and exiting the front door of an apartment, later identified as 2217 Noe Bixby Road in Columbus, Ohio (**TARGET LOCATION**). During this surveillance DAVIS was observed leaving the apartment, driving to the UDF located at 2660 Noe-Bixby Road in Columbus, Ohio and meeting with multiple individuals to include R.L. The following describes the observations made during surveillance of DAVIS on July 15, 2019:

   a. At approximately 1:56 p.m., investigators observed DAVIS leave the apartment complex located in the area of 2217 Noe Bixby Road. Upon leaving the complex, DAVIS was observed arriving in the UDF parking lot. Shortly after arriving, investigators observed R.L. as a passenger in a white Fiat in the parking lot of UDF. At this time, R.L. exited the Fiat, walked to DAVIS' vehicle and entered the rear of DAVIS' Chrysler 300 (**TARGET VEHICLE**). After a brief amount of time, R.L. exited DAVIS' vehicle, returned to the Fiat and left. Investigators followed DAVIS and an unidentified black male to the apartment complex where they were observed entering the front door of 2217 Noe Bixby Road.

   b. At approximately 2:55 p.m., investigators observed DAVIS exit the front door of apartment 2217 Noe Bixby with the unidentified black male. Upon exiting, DAVIS was observed leaving the complex in the black Chrysler 300 (**TARGET VEHICLE**). Shortly after departing from the apartment complex, DAVIS arrived at the UDF and eventually met with an unidentified white male at the rear passenger side of DAVIS' vehicle. After a brief amount of time, the white male returned to a white Saturn ION as the passenger. Investigators observed DAVIS and the Saturn ION leave the UDF parking lot. DAVIS and the unidentified black male were observed returning to 2217 Noe Bixby Road utilizing the front door to gain access to the residence.

   c. At approximately 4:28 P.M, investigators observed DAVIS and the unidentified male exit the front door of 2217 Noe Bixby. Upon exiting, they were observed leaving the apartment complex in the Chrysler 300

5

(**TARGET VEHICLE**). Investigators followed DAVIS to the UDF where DAVIS was observed meeting with unknown individual or individuals in a Nissan Sentra in the parking lot. At this time, DAVIS was observed leaving the parking lot followed by the Nissan Sentra. Investigators observed the passenger of the Nissan Sentra to be R.L. Upon leaving the UDF parking lot, investigators observed the Nissan Sentra leaving in tandem with DAVIS. Shortly after these observations were made, DAVIS' vehicle was observed stopped briefly in a nearby neighborhood. Your affiant knows, through training and experience, it is common for individuals who traffic narcotics to utilize techniques which involve the purchaser following the narcotics trafficker to a secondary location. This allows the narcotics trafficker to attempt to detect potential law enforcement who may be following the narcotics trafficker, this is commonly referred to as counter-surveillance.

    d.    At approximately 4:40 p.m., DAVIS returned to the UDF parking lot. Shortly after DAVIS' arrival, investigators observed DAVIS meet with the driver of a blue Honda. During the interaction, DAVIS was observed reaching inside the driver's window of the Honda. Following this observation DAVIS returned to his vehicle and both DAVIS and the Honda left the UDF parking lot.

    e.    At approximately 6:51 p.m., investigators observed DAVIS exit apartment 2217 Noe Bixby Road and leave the apartment complex in the Chrysler 300 (**TARGET VEHICLE**). Shortly after leaving, DAVIS was observed arriving in the parking lot of the UDF. Upon DAVIS' arrival, investigators observed DAVIS meet briefly with multiple individuals to include R.L. who was the front seat passenger in a white Mercedes. During this time, investigators observed DAVIS walk to the white Mercedes and interact with R.L. for a brief amount of time before leaving the UDF parking lot.

18.    Your affiant knows, through training and experience, the types of brief encounters as described being observed on June 13 and 15, 2019, are indicative of drug trafficking. Furthermore, investigators observed DAVIS leaving the residence, while operating the Chrysler 300 (**TARGET VEHICLE**), which is in close proximity to the UDF meeting location, and engaging in the described type of activity and quickly returning to the residence is indicative of drug trafficking activity. Your affiant knows it is common for narcotics traffickers to utilize public places to meet in order to complete narcotics transactions. At times, these meeting locations are within close proximity to their residence in order to allow the trafficker to have quick accessibility to the narcotics in which they sell. This also prevents the trafficker from possessing the drugs for an extended period of time which decreases the risk of being detected and interdicted by law enforcement.

19.    On July 3, 2019 investigators conducted surveillance on DAVIS. During

6

surveillance, SOI-1 and DAVIS were observed meeting at the Spot Free Car Wash located at 5466 E. Livingston Avenue in Columbus, Ohio. Prior to arriving in the area, GPS data transmitting from DAVIS' Chrysler 300 (**TARGET VEHICLE**) revealed DAVIS' vehicle parked in the apartment complex which houses 2217 Noe Bixby Road. While on surveillance, SOI-1 was observed meeting with DAVIS who arrived in the **TARGET VEHICLE**. Investigators observed SOI-1 with DAVIS near the trunk of DAVIS' vehicle prior to leaving the car wash. After a brief amount of time, SOI-1 and DAVIS departed from the Spot Free Car Wash.

20. Upon leaving the car wash, uniformed Ohio State Highway Patrol (OSHP) Sergeant initiated a traffic stop on the vehicle which SOI-1 was operating. The reason for the traffic stop on SOI-1's vehicle was due to the vehicle bearing an expired vehicle registration. During the course of the traffic stop, Whitehall Police Department Officer Dompier's certified K-9 partner Summit conducted a free-air sniff around the exterior of SOI-1's vehicle. Upon conducting the sniff, the K-9 had a positive indication for the odor of narcotics emitting from SOI-1's vehicle. During the course of the search, law enforcement located approximately 465.5 gross grams of a substance which field tested positive for methamphetamine. Law enforcement also seized approximately $3,730 which was located inside a locked box within the trunk of the vehicle. SOI-1 was operating. SOI-1 was transported to the DEA (Columbus) office to be interviewed.

21. After being advised of his Miranda Rights, SOI-1 voluntarily informed investigators he/she met with an individual known as "Juice" to obtain what SOI-1 believed to be a half pound to a whole pound of methamphetamine. SOI-1 was later able to positively identify "Juice" as Robert DAVIS utilizing a photograph of Robert DAVIS. According to SOI-1, DAVIS provided SOI-1 with the suspected methamphetamine to hold onto. SOI-1 stated that in exchange for holding onto the drugs and returning them to DAVIS at DAVIS's request, DAVIS would provide SOI-1 with $500.00 and a small amount of drugs. SOI-1 provided investigators with telephone number 614-679-4009 which is utilized by SOI-1 to contact DAVIS. Telephone toll analysis between SOI-1's telephone number and 614-679-4009 as well as surveillance corroborates information provided by SOI-1.

22. On or about July 25, 2019, Ohio State Highway Patrol (OSHP) conducted a traffic stop on a vehicle which was being operated by an individual identified for purposes of this affidavit as SOI-2. Prior to the traffic stop DEA observed SOI-2's vehicle arrive and park in the rear of an apartment building which houses DAVIS' primary residence. After a brief amount of time, members of DEA observed SOI-2's vehicle leave the apartment complex. Members of DEA maintained surveillance on SOI-2's vehicle until an Ohio State Highway Patrol Trooper initiated the traffic stop. Upon making contact with the driver, SOI-2, the Trooper immediately smelled the aroma of marijuana emitting from the vehicle. SOI-2

voluntarily uttered to the (OSHP) Trooper that he was in possession of "crystal meth". Your affiant knows, through training and experience, the term "crystal meth" is a slang term for methamphetamine. During the course of a probable cause search of the vehicle, law enforcement located approximately 369.8 gross grams of suspected methamphetamine.

23. After being advised of his Miranda Rights, SOI-2 voluntarily informed investigators the drugs, which SOI-2 admitted were methamphetamine, belonged to an individual known as "Juice." According to SOI-2, "Juice" had left the drugs in SOI-2's vehicle after SOI-2 had dropped "Juice" off at his residence. During the interview, SOI-2 informed Your affiant that "Juice" lives in an apartment complex off of Noe Bixby Road. SOI-2 stated "Juice" had asked SOI-2 to take the drugs to an individual due to "Juice" not being able to meet with the individual. SOI-2 stated they hadn't yet agreed to complete the narcotics transaction and alleged they were going to bring the methamphetamine back to "Juice" who was located at a YMCA on Karl Road. Although SOI-2 stated they hadn't yet agreed to complete the narcotics transaction for "Juice" SOI-2 admitted people would be expecting both money and the methamphetamine from SOI-2. SOI-2 further provided investigators with telephone number 614-679-4009 which SOI-2 stated is utilized by "Juice". Surveillance and telephone toll analysis between SOI-2's telephone number and 614-679-4009 corroborates communication between DAVIS and SOI-2.

24. On July 31, 2019, DEA TFO Smith established surveillance in the area of 2217 Noe Bixby Road in Columbus, Ohio. During the surveillance, TFO Smith observed DAVIS enter the front door of 2217 Noe Bixby Road. Upon leaving the area, TFO Smith observed a gold Lincoln parked in the rear of 2217 Noe Bixby Road while DAVIS was still inside the residence. Surveillance was terminated shortly after DAVIS was observed accessing the residence through the front door.

## IV.

## COMMON CHARACTERISTICS OF DRUG TRAFFICKERS

25. Based on my training, education, and experience, as well as training, education and experience of other law enforcement officers, I know:

    a. That drug traffickers often amass significant assets from their illegal drug trafficking activities.

    b. That drugs traffickers often maintain large amounts of U.S. Currency derived from illegal activities. It is common for individuals to secrete contraband and conceal proceeds of drug sales and records of drug transactions in secure locations such as personal residences or businesses where they have ready access and control. Often, these locations are used

8

to conceal the existence of substantial wealth from law enforcement authorities.

c. That drug traffickers also attempt to legitimize their profits by converting it into other assets, such as stocks, bonds, precious metals, jewelry, real estate, vehicles and other assets. To accomplish these goals, these individuals utilize false and fictitious business records, nominee purchasers, foreign and domestic banks, securities, cashiers checks, money drafts, letters of credit, brokerage houses, real estate shell corporations and business fronts. These individuals conceal, in their residences, businesses, safes, safe deposit boxes, storage units and vehicles, currency, cashier's checks, money orders and other negotiable instruments, as well as the records relating to the acquisition, conversion, movement, transfer, and disbursement of these funds and assets. Additionally, the drug traffickers themselves usually control access to these areas. Further, it is not uncommon for narcotics traffickers to "legitimize" their funds through casinos, documenting their "winnings" in an attempt to show an additional source of income.

d. That drug smugglers are not unlike other members of society in that they rely on credit and debit cards to make financial payments. Records relating to the use of these cards can provide valuable information to the investigation by establishing, among other things, the amount of money that is being spent by the suspects, their travel patterns (e.g., using a credit card to pay for gasoline on a cross-country trip), and may further identify businesses which are associated with the illegal activities of the suspects.

e. That drug traffickers deal in currency and store currency in conveyances, homes and at business sites. Furthermore, the Currency Transaction Report (CTR) (IRS Form 4789) is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction that exceeds $10,000. This requirement causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at financial institutions because these reports can be made available to law enforcement officials. It is quite common for individuals who deal in illegal controlled substances to convert drug proceeds (currency) into cashiers checks and or money orders in amounts less than $10,000 at numerous financial institutions over the course of several days in order to avoid the CTR filing requirement. Furthermore, drug traffickers often recruit other individuals to convert drug proceed currency for them in order to avoid handling the currency themselves.

f. That drug traffickers use financial habits designed to minimize and hide a paper trail. Traffickers often purchase and/or title their assets in fictitious names, aliases, or in the names of relatives, friends, associates or business entities to avoid detection of these assets by government agencies,

9

especially the Internal Revenue Service. Regardless of documented ownership, the drug traffickers continue to use these assets and exercise control over them.

g. That drug traffickers maintain books, records, receipts, notes, ledgers, bank records, accounting records and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of controlled substances. These ledgers often contain amounts of drugs; accounting of payments made and received, accounts receivable and accounts payable used in furtherance of their drug trafficking activities. These individuals commonly "front" (provide illegal controlled substances on consignment) illegal controlled substances to their clients and thus keep some type of record concerning moneys owed. Drug traffickers often maintain phone books, address books and other papers containing names, telephone numbers, and addresses of suppliers and purchasers of controlled substances. The names and numbers are often written in a code that requires drug traffickers to keep a key to their particular code.

h. The aforementioned books, records, receipts, notes, ledgers, codes, etc., are usually maintained in a secure location where dealers in illegal controlled substances have ready access to them such as on their person, vehicle, business, safe deposit box, home safe, personal or business computer, storage facility or in other residences or businesses where they periodically reside or have access and control.

i. It is not uncommon for individuals who deal in illegal controlled substances to take, or cause to be taken, photographs of themselves, their associates, their property and their illegal product. These individuals usually maintain these photographs in their possession or in residences where they reside or have access and control.

j. That drug traffickers commonly use cellular telephones to coordinate various narcotics trafficking activities. Several traffickers that I interviewed were under the false impression that it was impossible for law enforcement to wiretap cellular telephones. Other traffickers, in order to avoid speaking on telephones, use numeric codes on digital pagers to communicate with co-conspirators.

k. That drug traffickers often engage in domestic and/or international travel in relation to the smuggling of illegal contraband. Analysis of travel records and documents can assist in the development of the investigation by revealing potential source and/or destination locations related to the distribution of illegal narcotics or the payment of related proceeds.

l. Persons who traffic in controlled substances are not unlike any other individual in our society in that they maintain documents and records.

These documents and records will normally be retained for long periods regardless of whether their value to the individual has diminished. Often times, this type of evidence is generated, maintained and subsequently forgotten about. Hence, documents that one would normally think a prudent person would destroy because of their incriminating nature are still possessed months or even years after they come into the possession of a drug trafficker. Often times these individuals do not even realize the incriminating nature of the documents they keep.

26. Based upon Your affiant's knowledge, training and experience, and the experience of other law enforcement personnel, I am aware that persons who traffic in controlled substances commonly utilize vehicles to transport, store and conceal controlled substances and or currency which is derived from drug trafficking. It is common for narcotics traffickers to utilize hidden compartments within their vehicle to store said illegal narcotics and or proceeds from narcotics trafficking in order to prevent detection and interdiction from law enforcement.

V.

CONCLUSION

27. Based on the facts set forth in the Affidavit, Your Affiant believes there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime and associated with the above listed drug trafficking offenses is located inside the **TARGET LOCATION** and **TARGET VEHICLE.** WHEREFORE, based on the foregoing evidence of drug trafficking, I respectfully request that the Court issue a search warrant and sealing order for the locations described in Attachment A and the property described in Attachment B. Investigators request that this warrant be SEALED.

Jacob Smith
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me
this 21 of August, 2019

NORAH MCCANN KING
United States Magistrate Judge

11